PERKINS COIE

1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711

T +1.212.262.6900
F +1.212.977.1649
PerkinsCoie.com

August 10, 2020

Matthew J. Moffa
MMoffa@perkinscoie.com
D. +1.212.261.6857
F. +1.212.399.8057

**VIA ECF**

The Honorable Jed S. Rakoff, United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:** ***Carnegie Institution of Washington and M7D Corporation v. Pure Grown Diamonds, Inc., et al.*, 1:20-cv-00189-JSR; *Carnegie Institution of Washington and M7D Corporation v. Fenix Diamonds LLC*, 1:20-cv-00200-JSR.**

Your Honor:

Plaintiffs submit this letter brief in support of the privilege redactions in two PowerPoint presentations produced to Defendants at CARN-FEN_00115436 / CARN-PGD_00115709 and CARN-FEN_00115466 / CARN-PGD_00115739.

**The Redacted Documents**

The redacted documents at issue are two versions of a draft PowerPoint presentation (the "Presentation"). The first version was attached to a confidential email sent the morning of November 6, 2018. The second version was attached to a confidential email sent the evening of the same day. The emails were produced to Defendants in their entirety, while the Presentation was produced with redactions only on slides 6, 7, and 8. While the two PowerPoint files differ slightly, the three redacted slides (6, 7, and 8) are identical in both drafts. The redacted information reflects confidential attorney-client communications made from Perkins Coie attorneys to their client Huron Capital regarding the validity, enforceability, and strength of M7D's intellectual property. Plaintiff M7D produced these documents from their email records but redacted this information in view of their contractual obligation to preserve Huron's privilege—and in view of their ongoing common legal interests.

**Argument**

In 2018, M7D hired TM Capital to facilitate investment in M7D. Huron was seeking to invest in M7D—an investment Huron ultimately made.[1] The emails reflect joint efforts by Huron, M7D,

---

[1] The governing nondisclosure agreement ("NDA") between TM Capital and M7D is provided as Exhibit A (redacted for public filing), and the governing NDA between Huron and M7D (via TM Capital) is provided as Exhibit B. Although counsel have not identified countersigned copy of

and TM Capital to find lenders to support Huron's investment in M7D. As part of this endeavor, Huron, M7D, and TM Capital agreed to share—in confidence—Perkins Coie's evaluation of M7D's intellectual property. All email recipients were employees of Huron, M7D, or TM Capital.

Huron is now an investor in, and hence part owner of, M7D. Whether measured in 2018 or today, these email recipients held the common legal interest of ensuring the validity, enforceability, and strength of M7D's intellectual property. For this reason, privileged communications shared confidentially from Huron to M7D (directly or through its agent TM Capital) in support of that interest remain privileged under the common-interest doctrine.

It is undisputed that Huron and M7D currently share a common legal interest. Defendants appear to believe, however, that the common-interest privilege did not apply until the investment deal was inked. Defendants are wrong on the law.

***Federal Caselaw***

Federal courts around the country have considered whether the common-interest doctrine applies to IP-related documents exchanged during negotiations. Following a seminal Federal Circuit case, *In re Regents of University of California,* 101 F.3d 1386 (Fed. Cir. 1996), courts from New York to California have all found that the common-interest privilege protects communications between an intellectual property holder and a party evaluating an interest in the intellectual property.

In *Regents*, the Federal Circuit granted a writ of mandamus and held that common-interest privilege protected communications between a patent holder and a company that had an "option" to license the patent (which it later exercised). *Id.* The court explained that the patentee was "seeking valid and enforceable patents to support royalty income" and the optionee was "seeking valid and enforceable patents to support commercial activity. Valid and enforceable patents on the UC inventions are in the interest of both parties…. 'The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.'" *Id.* at 1390 (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1172 (D.S.C. 1974)). The court thus held that "the joint client doctrine and the community of interest doctrine apply to and protect legal advice and communications between the [IP holder] and attorneys of its optionee/licensee," including communications that took place before the license was executed. *Id.* at 1391.

Courts around the country have followed suit. In *Morvil Technology, LLC v. Ablation Frontiers, Inc.*, No. 10-CV-2088-BEN (BGS), 2012 WL 760603, at *3 (S.D. Cal. Mar. 8, 2012), the court held that privileged documents exchanged during negotiation for a corporate acquisition were

---

Exhibit B, M7D has confirmed that the document accurately reflects the binding confidentiality terms offered by TM Capital, and accepted by Huron, for M7D's benefit.

protected, holding that "the communications addressing the scope of the IP certainly were designed to further [a] . . . mutual interest in valid and enforceable patents." In *TC Technology LLC v. Sprint Corp.*, No. 16-CV-153-RGA, 2018 WL 6584122, at *5 (D. Del. Dec. 13, 2018), the court held that the privilege applied to communications between two companies who were negotiating to form a joint venture for patent acquisition, explaining, "I see no reason why the formation date [of the joint venture] should be a hard cut-off for privilege." And, in *Crane Security Technologies, Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 16 (D. Mass. 2017), the court held that "communications concerning the strength and enforceability of patents between parties who are negotiating exclusive patent licenses are protected under the common-interest doctrine, even though the communications obviously have a commercial purpose, as well." The list goes on.[2]

The Southern District of New York treats the issue the same way. In *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 Civ. 8833 (RPP), 1998 WL 158961 (S.D.N.Y. Apr. 1, 1998), the court followed the *Regents* decision, holding that a "community of interest" applied between a patent holder and a company with an option to a license. *Id.* at *1-2.

Courts are particularly likely to find a common interest when there is a formal contractual agreement. While there is no "firm rule that parties must have a written agreement or have filed suit to share a legal interest," *TC Technology*, 2018 WL 6584122, at *5, an NDA or an agreement to assist in obtaining legal services (*e.g.* a joint defense agreement or patent prosecution assistance agreement) can serve as additional evidence of a shared legal interest. Similarly, evidence that the parties are actually working together demonstrates a common legal interest. *See*, *e.g.*, *Crane,* 230 F. Supp. 3d at 18 (NDA, mutual assistance agreement, and the "tenor of the parties' communications" showed "they considered these communications to be confidential").

***M7D and Huron Shared a Common Legal Interest***

Turning to the documents at issue, the redacted information reflects legal advice from Perkins Coie to its client, Huron Capital, concerning the strength and enforceability of M7D's IP. Perkins Coie's legal advice was undoubtedly privileged when it was shared with Huron. The privilege was not destroyed by Huron sharing the information with the IP holder itself (M7D) nor with the company M7D hired to assist with the investment (TM Capital) in the context of pursuing investment to implement and enforce that intellectual property. *Regent* instructs that the common-interest doctrine protects otherwise privileged communications that are shared between two parties who have such a common interest. Huron would not have shared Perkins' analysis without assurance

[2] *E.g.*, *Hilsinger v. Eyeego, LLC*, No. 13-cv-10594-IT, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015); *BriteSmile, Inc. v. Discus Dental, Inc.*, No. C 02–3220 JSW (JL), 2004 WL 2271589, at *2 (N.D. Cal. Aug. 10, 2004); *Tenneco Packaging Specialty & Consumer Prod., Inc. v. S.C. Johnson & Son, Inc.*, No. 98 C 2679, 1999 WL 754748, at * 2 (N.D. Ill. Sept. 14, 1999).

that M7D and TM Capital (or, for that matter, any other recipient) would preserve its privilege.

The common interest can predate the actual investment. Here, all evidence shows that Huron and M7D were aligned in 2018 and remain aligned today. First, Huron and M7D signed an NDA in early 2018 covering information exchanged during negotiations. This NDA ***expressly*** provided that communications would remain confidential and privileged, under Delaware law. Ex. B at 3 ("This Agreement will be governed by and construed in accordance with the laws of the State of Delaware"), 4 ("the Company is not waiving, and shall not be deemed to have waived or diminished, its attorney work-product protections, attorney-client privileges, or similar protections and privileges"); *see also id.* at 1 (ensuring Evaluation Material will be kept strictly confidential).

Second, the privileged information that was exchanged concerned intellectual property matters on which the parties were legally aligned; Huron, as a potential investor, shared M7D's interest in ensuring that its intellectual property was strong, valid, and enforceable.

Third, Huron and M7D did in fact complete their investment agreement. While not dispositive,[3] this is further evidence that the parties were (and are) aligned in a common legal goal. Of note, Huron and M7D have agreed to share the same counsel in this litigation (Perkins Coie), evidencing that Huron and M7D *still* see alignment of their interests in the enforcement of M7D's IP.

The involvement of TM Capital in the redacted communication is of no moment. TM Capital was hired by M7D to represent M7D in obtaining investment in the company and its IP. Their agreement appropriately preserved confidence over their communications, ensuring information regarding the patents, procedures, processes, and know-how of the company remained the confidential property of M7D. *See* Ex. A at 2. And TM Capital joined in the June 2018 NDA to ensure further communications would remain confidential and expressly privileged. Ex. B.

***Defendants' Caselaw is Unavailing***

Defendants cited two cases during the initial oral argument, but these cases do not compel a different result. In fact, they are the exceptions that prove the rule. Both *Katz v. AT&T Corp.*, 191 F.R.D. 433 (E.D. Pa. 2000) and *Network-1 Technologies, Inc. v. Google LLC*, No. 14-CV-02396 (PGG)(SN), 2019 WL 6701909 (S.D.N.Y. Dec. 9, 2019) followed the *Regents* standard but turned on unique facts and different burdens. In *Katz*, the court found "the record evidence is sufficiently ambiguous as to the existence of an identity of interest to preclude overturning the decision of the Special Master as clearly erroneous." 191 F.3d at 438. In *Network-1*, the patent owner sold his IP outright and thus had a "diminished" interest in the IP; and many of the communications at issue did not contain legal advice. 2019 WL 6701909, at *2. In contrast, Huron remains an investor in

[3] *See Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987).

M7D to this date and the redacted material directly reflects attorney advice.

Defendants also claim that the Second Circuit requires a narrow application of the common-interest doctrine. But Defendants do not identify why Second Circuit privilege law applies here. M7D is based in Maryland and incorporated in Delaware. Huron is based in Michigan. Both NDAs contain Delaware choice of law provisions, and the Perkins Coie attorneys involved in the privileged communication are based in Washington, D.C. The communications occurred in 2018, long before this lawsuit was filed. The parties clearly contemplated privilege protection in 2018, *see* Ex. B at 4, and did so without anticipating a narrow Second Circuit construction.

Even if Second Circuit law applies, it is not as narrow as Defendants claim. Defendants cited *United States v. Krug*, 868 F.3d 82 (2d Cir. 2017), for the proposition that statements made outside the presence of a lawyer cannot be privileged. *Krug* merely held that the common-interest privilege did not apply to a particular communication between two ***criminal co-defendants***—a communication which "occurred outside the presence of any lawyer" and in which "[n]o legal advice was mentioned, much less shared or otherwise conveyed." 868 F.3d at 87. That is not the situation here. More on point, the Second Circuit has preserved communication as attorney-client privileged *and* work-product privileged under the common-interest doctrine even when shared with a "consortium of banks" sharing a common legal interest, and even in the absence of "ongoing litigation." *See Schaeffler v. United States,* 806 F.3d 34, 37, 40 (2d Cir. 2015). The redacted information at issue here reflects legal advice from Perkins Coie attorneys, information that is undoubtedly privileged. That privilege was not waived.[4]

Respectfully submitted,

/s/ Matthew J. Moffa

Matthew J. Moffa

cc: Counsel of record (via ECF)

---

[4] Although not at issue here, Defendants will likely argue that a subsequent sharing of *another* presentation—not the documents in question—on November 7, 2018 to a discrete number of lenders waived privilege over the November 6 communication. Defendants' motion concerns *only* the two draft presentations identified on Plaintiffs' privilege log. Defendants have identified no factual basis to allege any subsequent waiver. *See JA Apparel Corp. v. Abboud*, No. 07 CIV. 7787 (THK), 2008 WL 111006, at *2 (S.D.N.Y. Jan. 10, 2008) ("there is simply no basis upon which the Court can find a waiver based on the incomplete factual record before it"). Regardless, even if *arguendo* the redacted information had been presented on November 7, counsel's investigation has confirmed that the November 7 presentation was made under NDAs to lenders of equally-aligned legal interest in a manner that continued to preserve the privilege.