## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CARNEGIE INSTITUTION OF WASHINGTON, and M7D CORPORATION, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 1:20-cv-0200 (JSR) |
| FENIX DIAMONDS LLC, | § § | |
| Defendant. | § § § | |

## PLAINTIFF CARNEGIE INSTITUTION OF WASHINGTON'S OPPOSITION TO FENIX'S MOTION FOR ATTORNEY FEES AND OTHER NON-TAXABLE EXPENSES

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

    A.   Carnegie Science and M7D .......................................................................2

    B.   The Patents-in-Suit....................................................................................3

        1.   The '078 Patent ...............................................................................3

        2.   The '189 Patent ...............................................................................4

    C.   The Nouveau Affidavit ..............................................................................4

    D.   Plaintiffs' Infringement Arguments For the '078 Patent ...........................6

        1.   Growth of Single-Crystal Diamond on the Growth
            Surface ............................................................................................6

            (a)   Plaintiffs' Reasonable Basis for Asserting
                 Nouveau's Non-Monocrystalline Growth
                 was Insubstantial ................................................................6

            (b)   Plaintiffs Did Not Seek to Relitigate The
                 Construction of "Growth Surface" on
                 Summary Judgment .............................................................8

        2.   Maintenance of 20-Degree Temperature Gradients............................10

    E.   '189 Patent ...............................................................................................11

    F.   Plaintiffs' Covenants Not to Sue...............................................................12

    G.   Appeal ......................................................................................................12

III. ARGUMENT .....................................................................................................13

    A.   *Octane Fitness* Does Not Support Penalizing Carnegie
        Science ......................................................................................................13

    B.   Plaintiffs' Claims Were Not Unreasonable................................................13

        1.   Infringement of the '078 Patent ......................................................13

            (a)   Plaintiffs' Argument Regarding

**TABLE OF CONTENTS**
(continued)

Page

Insubstantial Non-Monocrystalline Growth on the Growth Surface Was Not Foreclosed by the *Markman* Order ................................................................. 14

(b)    Plaintiffs' Contention That Nouveau's Process Maintained 20-Degree Temperature Gradients Without Using Measured Temperatures Was Not Foreclosed by the *Markman* Order ................................................................ 15

2.    Infringement of the '189 Patent ..................................................... 16

C.    Fenix's Conduct Illustrates Plaintiffs Were Not Clearly Unreasonable ................................................................................................. 17

D.    Plaintiffs' Litigation Tactics Were Not Exceptional ....................................... 18

1.    M7D's Customer Communications Do Not Support Fee-Shifting ....................................................................................... 18

(a)    The Timing of the Alleged Communications Precludes an Exceptional Case Finding ................................... 18

(b)    Fenix's Case Law Precludes an Exceptional Case Finding ...................................................................... 19

2.    Plaintiffs Did Not Unnecessarily Drive Up Litigation Costs ........................................................................... 20

3.    The '078 Is Not Invalid for Lack of Enablement and Plaintiffs Did Not Withhold Any Evidence ......................................... 21

4.    Fenix and Nouveau Did Not Cooperate in Providing Requested Discovery from Nouveau ..................................................... 22

E.    The Court Should Deny Fenix's Request for Attorney Fees ........................... 23

1.    The Court Should Deny Fenix's Request for Attorney Fees Under Section 285 ...................................................... 23

2.    The Court Should Deny Fenix's Request for Attorney Fees and Non-Taxable Costs Under The Court's Inherent Power ........................................................................ 24

F.    The Court Should Apportion Any Award Entirely to M7D ........................... 24

- ii -

**TABLE OF CONTENTS**
(continued)

<u>Page</u>

**IV.**    CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

Page

**Cases**

*AdjustaCam, LLC v. Newegg, Inc.*,
   861 F.3d 1353 (Fed. Cir. 2017)..................................................................................23

*Alcon Research Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014)..................................................................................17

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
   23 F.3d 374 (Fed. Cir. 1994)......................................................................................24

*Biax Corp. v. Nvidia Corp.*,
   626 Fed. Appx. 968 (Fed. Cir. 2015) ...................................................................14, 15

*Carnegie Inst. of Wash. v. ALTR, Inc.*,
   No. 1-20-cv-00198, ECF 19 (S.D.N.Y. Mar. 3, 2020)...............................................3

*Carnegie Institution of Washington et al v. Pure Grown Diamonds*, Inc. et al.,
   SDNY-1-20-cv-00189 (Nov. 20, 2020). ......................................................................3

*Cognex Corp. v. Microscan Sys., Inc.*,
   No. 13-cv-2027 (JSR), 2014 WL 2989975 (S.D.N.Y. June 30, 2014)......................23

*Evident Corp. v. Church & Dwight Co.*,
   399 F.3d 1310 (Fed. Cir. 2005)............................................................................24, 25

*Fox v. Vice*,
   563 U.S. 826 (2011)....................................................................................................18

*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*,
   790 F.3d 1369 (Fed. Cir. 2015)..................................................................................17

*GT Dev. Corp. v. Temco Metal Prods. Co.*,
   No. C04-451Z, 2005 WL 8172247 (W.D. Wash. July 1, 2005).........................19, 20

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
   248 F.3d 1333 (Fed. Cir. 2001)..................................................................................24

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
   22 F.4th 1369 (Fed. Cir. 2022) ..................................................................................21

*In re M7D Corp.*,
   No. 1:23-bk-11699 (Del. Bankr. Oct. 11, 2023)..................................................3, 20

## TABLE OF AUTHORITIES
(continued)

Page

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
    726 F.3d 1359 (Fed. Cir. 2013)................................................................17, 18

*Munchkin, Inc. v. Luv n'Care, Ltd.*,
    960 F.3d 1373 (Fed. Cir. 2020)........................................................................13

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)................................................................................2, 13

*Qualcomm Inc. v. Broadcom Corp.*,
    548 F.3d 1004 (Fed. Cir. 2008)........................................................................21

*Stone Basket Innovations, LLC v. Cook Med. LLC*,
    892 F.3d 1175 (Fed. Cir. 2018)..............................................................2, 17, 18

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
    726 F.3d 1306 (Fed. Cir. 2013)........................................................................23

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    745 F.3d 513 (Fed. Cir. 2014)........................................................................22

*ThermoLife Int'l LLC v. GNC Corp.*,
    922 F.3d 1347 (Fed. Cir. 2019)........................................................................18

*Zenith Elecs. Corp. v. Exzec, Inc.*,
    182 F.3d 1340 (Fed. Cir. 1999)........................................................................20

**Statutes**

35 U.S.C. § 285.................................................................................... *passim*

## I.       INTRODUCTION

Defendant's motion for fees and other non-taxable costs should be denied because the litigation was a good faith pursuit by Plaintiffs that ultimately was withdrawn on appeal due to ███████████████████████████████. This is a garden-variety patent lawsuit—not an "exceptional case" warranting fee-shifting under § 285. Defendant's motion is predicated on the fundamentally flawed premise that an affidavit from Defendant's supplier, Nouveau Diamonds, LLC ("Nouveau Affidavit"), on its own, established non-infringement so conclusively that continuing to litigate transformed this lawsuit into an "exceptional case" under § 285. ECF 163 at 1-2. In actuality, the Nouveau Affidavit was not sufficient for the Court to reach its summary judgment decision, nor was it the only evidence Defendant believed necessary to prove non-infringement. In its summary judgment order, the Court emphasized two pieces of information in the Nouveau Affidavit. *First*, the Court found "one can plainly see that the non-monocrystalline growth is extensive" in Views 6-10 of the Nouveau Affidavit, thus indicating the non-monocrystalline growth was not "insubstantial." ECF 133 at 19. *Second*, the Court found testimony in paragraph 5.k of the Nouveau Affidavit established "the fact that Nouveau does not even measure temperature gradients during diamond growth, and this fact supports an inference that Nouveau does not maintain 20-degree temperature gradients." *Id.* at 27. But importantly, neither Defendant nor the Court relied exclusively on the Nouveau Affidavit in summary judgment. To the contrary, all parties relied on evidence and expert testimony developed during discovery in the months following service of the Nouveau Affidavit.

This reliance on post-affidavit discovery flatly contradicts Defendant's current story that all work in this case after July 14, 2020, was unreasonable. If the Nouveau Affidavit and the Court's claim construction order had, in fact, cleanly resolved the case, Defendant could and

should have written a Rule 11 or § 285 letter to Plaintiffs explaining "with precision" the winning arguments. *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1181-83 (Fed. Cir. 2018). Moreover, if the Nouveau Affidavit and the Court's claim construction order had cleanly resolved the case, then Defendant would not have raised its multitude of failed summary judgment arguments or sought to introduce, for example, Nouveau's additional testing evidence not provided with the Nouveau Affidavit. Defendant's actions thus confirm that the post-affidavit litigation activity does not render this case exceptional and explains why Defendant was never able to give notice, set out with precision, regarding the basis for a fee award.

Perhaps recognizing the faulty foundation on which its argument rests, Defendant attempts to cobble together allegations of other purported "misconduct" by Plaintiffs. But as explained in Section III.D, *infra*, these arguments also fail as a matter of law. The alleged misconduct is also attributable to only one Plaintiff, M7D.

Accordingly, Defendant's motion for fees should be denied because the case at bar is not "the rare case in which a party's unreasonable conduct–while not necessarily independently sanctionable–is nonetheless so 'exceptional' as to justify an award of fees." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553-56 (2014).

However, should this court disagree and grant fees to Defendant, M7D should be solely liable for the award because M7D, as licensee, initiated, led, managed, and made all critical litigation decisions upon which the fees in this matter are based.

## II.     FACTUAL BACKGROUND

### A.     Carnegie Science and M7D

Carnegie Institution of Washington ("Carnegie Science") is a renowned non-profit,

institution, founded in 1902, that is dedicated solely to basic scientific research. Researchers at Carnegie Science developed the use of microwave plasma chemical vapor deposition (MPCVD) technology at issue in this case.

Carnegie Science granted M7D[1] an exclusive field of use license to the asserted patents in 2011. Exs.[2] 1-4.[3] Under Section 6.1.2 of the 2018 amended license agreement, M7D—as licensee—had the "███████████████████████████████████████" to enforce its rights under the agreement. *See* Ex. 2 at 5. Carnegie Science was required to reasonably cooperate in any such litigation. *Id*. at 5-6.

M7D filed suit in this Court against Fenix as well as ALTR, Inc. and Pure Grown Diamonds, Inc. The ALTR suit settled and was dismissed March 3, 2020. *See Carnegie Inst. of Wash. v. ALTR, Inc.,* No. 1-20-cv-00198, ECF 19 (S.D.N.Y. Mar. 3, 2020). The Pure Grown Diamonds suit—which was subject to the *Markman* order in this case—settled and was dismissed November 20, 2020. *See Carnegie Inst. of Wash. v. Pure Grown Diamonds, Inc.,* No. 1-20-cv-00189, ECF 122 (S.D.N.Y. Nov. 20, 2020).

**B.    The Patents-in-Suit**

**1.    The '078 Patent**

The '078 patent describes an improved method for growing diamonds, in particular, large, high-quality, single-crystal diamonds. Ex. 6 (Capano Rpt.), ¶ 63. It was known that MPCVD methods could produce "small quantities [of diamond]," but the known processes resulted in slow growth rates. *Id.*, ¶ 62. The '078 patent explains various approaches for

---

[1] On October 11, 2023, M7D filed for Chapter 7 bankruptcy. *In re M7D Corp.*, No. 1:23-bk-11699 (Del. Bankr. Oct. 11, 2023).

[2] Unless otherwise noted, all exhibits are exhibits to the Declaration of Matthew J. Meyer.

[3] *See also* Ex. 5 (Williams Depo.) at 30:9-18, 130:13-18, 196:13-197:3, 207:4-18 (explaining licensee "Washington Diamonds" is M7D).

growing high-quality, single-crystal diamonds at much quicker rates by establishing, applying, and adjusting control parameters to limit the temperature gradients between any two points on the growth surface to less than 20 °C. ECF 162-1 at 4:59-64, 6:17-25, 6:55-65, 12:21-46.

### 2. The '189 Patent

The '189 patent describes methods of improving the optical clarity of single-crystal CVD diamonds. *See* Ex. 7 (Gleason Rpt.), ¶ 87.

### C. The Nouveau Affidavit

On May 8, 2020, the Court issued its *Markman* order, construing several terms of both patents. ECF 42. On June 14, 2020, Fenix served Plaintiffs with the Nouveau Affidavit purportedly describing the MPCVD process for Fenix's diamonds.

Fenix's fee motion rests on the false premise that "[a]lthough Plaintiffs never doubted the Affidavit, they persisted in litigating this case, resulting in a multitude of unnecessary depositions, expert reports, and summary judgment motions." ECF 163 ("Mot.") at 1. Not so. The record is clear that Plaintiffs *always* reasonably doubted the veracity, authenticity, and admissibility of the Nouveau Affidavit and thus sought discovery on objective evidence of Nouveau's manufacturing processes created in the normal course of business.

As explained in, for example, Plaintiffs' June 29, 2020 letter brief requesting an order to compel production from Fenix relating to Nouveau, Plaintiffs immediately recognized the Nouveau Affidavit and accompanying documents as "self-serving declarations, photos, and videos which appear to be created for this litigation or carefully curated in an attempt to demonstrate noninfringement" and sought additional discovery, including via a Hague Request, to further investigate the affidavit's contentions and authenticity. *See* ECF 58 at 2.

Plaintiffs' suspicions regarding the veracity of the affidavit were ultimately confirmed

through its efforts during fact discovery. For example, the Nouveau Affidavit states ██████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████. ECF 164-5 at ¶¶ 5.H and 5.I. When

Plaintiffs' expert, Dr. Capano, was permitted to review the pertinent source code, his analysis

confirmed that the Nouveau Affidavit was <u>not</u> accurate in stating ████████████████████

██████████████████████████ because "the source code shows ████████

███████████████████████████████████████████████████████████████████████

████████████████████████████ Ex. 6 at ¶¶ 301-303.

Not only did the Nouveau Affidavit make erroneous statements about the conditions

under which Fenix's diamonds are grown, *Fenix itself* considered the Nouveau Affidavit

insufficient to support its non-infringement arguments. Fenix not only procured additional

information from Nouveau to support its October 9, 2020 rebuttal expert report from Dr.

Pinneo, it relied upon that evidence in its motion for summary judgment. *See* ECF 106 at 12

(citing ECF 98 at ¶¶ 65-69 (citing Pinneo Report (ECF 99-6) at ¶¶ 178-81, 224-55, 264-268).

The Court has noted that "Plaintiffs chose to file this suit against Fenix and not against

Nouveau,[4] and with that decision came certain risks" related to discovery. ECF 133 at 21.

Indeed, Plaintiffs were not able to acquire all the discovery they sought from Nouveau by the

end of fact discovery, and the evidence of Nouveau's processes is far from complete.

Importantly, however, Plaintiffs filed this suit in January 2020 prior to the global

COVID pandemic. *See generally*, ECF 1. To Plaintiffs' (and the world's) surprise, the COVID

pandemic hit shortly thereafter and continued throughout the entirety of the fact discovery

period in this case. Indeed, during negotiations for an inspection of the Nouveau facility on

---

[4] This brief corrects any misspellings of Nouveau's name in the record without annotations.

reasonable terms, Plaintiffs were warned "Nouveau's plant is in a COVID hotzone. Many of the factory employees have recently been diagnosed with COVID and it may be spreading in the plant. The inspector will need to acknowledge and waive this risk." ECF 162-16 at 1.

While Fenix's motion faults Plaintiffs for their decision to value the safety of their attorneys and experts by waiting for a suitable opportunity for the inspection—which ultimately never materialized—that decision was eminently reasonable under the circumstances and in no way supports Fenix's claims for attorney fees back to July 2020.

Plaintiffs' doubts about the evidentiary value of the Nouveau Affidavit continued through summary judgment. *See e.g.*, ECF 117 at 10-11 (No. 31); ECF 114 at 12-14. In some respects, the Court agreed with Plaintiffs' doubts. *See* ECF 133 at 16 n.3 ("reject[ing] Fenix's assertion that the Affidavit is … self-authenticating").

### D.    Plaintiffs' Infringement Arguments For the '078 Patent

#### 1.    Growth of Single-Crystal Diamond on the Growth Surface

The asserted claims of the '078 Patent require "growing single crystal diamond … on the growth surface." The Court's *Markman* order construed single-crystal diamond to mean "a stand alone diamond having insubstantial non-monocrystalline growth" and growth surface to mean "the surface upon which diamond growth is occurring." ECF 42 at 18-20, 27-29. Fenix moved for summary judgment alleging "[b]ecause Nouveau grows substantial non-monocrystalline material on the growth surface, it does not grow single-crystal diamond." ECF 106 at 10. Plaintiffs opposed due to material factual disputes. *See generally* ECF 110 (PSOF), ECF 112 (Plaintiffs' Rule 56.1 counter statement), ECF 114 (Plaintiffs' opposition brief).

##### (a)    Plaintiffs' Reasonable Basis for Asserting Nouveau's Non-Monocrystalline Growth was Insubstantial

Plaintiffs' expert, Dr. Capano, testified that whether the '078 patent claims are met by a

particular diamond could be "determined by procedures that one would take post-growth." Ex.
8 (Capano Dep.) at 108:10-14. Specifically, Dr. Capano explained that "[i]f a single crystal is a
size that meets the growth objective, then the surrounding material, no matter how much there
is, does not eliminate the fact that you have grown a single crystal." *Id.* at 110:3-111:3. Dr.
Capano further explained that the non-monocrystalline material surrounding the single-crystal
material would be insubstantial "to the extent that you can remove that material." *Id.* at 115:20-
116:4. He explained the non-monocrystalline growth "becomes substantial if the growth
process would be deemed as a failure, meaning you could not use the single-crystalline material
to either form gemstone or to be functional in any other application." *Id*. at 116:11-22.

Nouveau's diamond blocks contain "non-diamond or graphitized polycrystalline
diamond," which is "cut away" during Nouveau's process. Ex. 6 at ¶ 172. Dr. Capano arranged
for a rocking curve analysis on a finished-diamond sample Plaintiffs received from Fenix (i.e.,
one where the non-monocrystalline growth had been removed), which Fenix represented was
manufactured by Nouveau. *Id.* at ¶¶ 277-278. Dr. Capano reviewed the analytical results and
concluded that "diamonds produced by Nouveau are single crystal and have insubstantial
amounts of non-monocrystalline growth." *Id.* at ¶ 278. Because the polycrystalline material can
be cut away (i.e., removed) from Nouveau's diamonds, which were indisputably grown on the
"growth surface," they are stand-alone diamonds "having insubstantial non-monocrystalline
growth." *Id.* at ¶¶ 270-278; Ex. 8 at 108:10-14, 110:3-111:3, 115:20-116:4. Plaintiffs thus had
reason to contend a skilled artisan would understand the Nouveau process involves "growing
single-crystal diamond … on the growth surface" under the Court's *Markman* order. *Id*.

In its summary judgment order, however, the Court clarified that Dr. Capano's analysis
of how a skilled artisan would determine whether non-monocrystalline material was

"insubstantial" was not correct. The Court explained that "because [Plaintiffs'] evidence relates exclusively to the finished product, not to the diamonds as grown, it is neither disputed nor relevant." ECF 133 at 18. Rather, the Court explained that because "one can plainly see that the non-monocrystalline growth is extensive" from Views 6-10 of the Nouveau Affidavit, there was "no basis for a reasonable factfinder to conclude Nouveau's non-monocrystalline growth is insubstantial." *Id.* at 19.

### (b)   Plaintiffs Did Not Seek to Relitigate The Construction of "Growth Surface" on Summary Judgment

The Court's summary judgment order characterized Plaintiffs' additional argument "that the parasitic growth on the interstices of Nouveau's diamond blocks is to be expected and is, therefore, 'insubstantial'" to be an attempt to relitigate the Court's construction of "growth surface." *See* ECF 133 at 18-20. But Plaintiffs, in fact, were pressing to have an ambiguity in the *Markman* order resolved in their favor.

The dispute boiled down to whether graphite[5] and other non-diamond carbon was, in fact, "diamond." The *Markman* order construed "growth surface" as "the surface upon which <u>diamond</u> growth is occurring." ECF 42 at 18-20 (emphasis added).[6] The Court's *Markman* order did not hold that "diamond" refers to all domains of growth, including "graphite" and "diamond-like carbon." *See generally, id.*; *see also id.* at 26 ("elemental carbon will exist as

---

[5] During the CVD growth process, hydrocarbon gases may accrue within the growth chamber not only into new diamond but also into forms of non-diamond carbon, including graphite. Ex. 6 at ¶¶ 78-79, 103, 168, 216.

[6] The *Markman* order also explained "[t]he "growth surface" refers to "the entire surface where hydrocarbon gases are accruing <u>into new diamond</u>." ECF 42 at 19 (emphasis added). In response to a deposition question excluding the "into new diamond" portion of the *Markman* order, Dr. Capano explained he was "not willing to include the entire surface upon which hydrocarbon gases are accruing" because "that's contrary to the Court's construction." Ex. 8 at 180:21–181:4. In addition to reading out the "into new diamond" language, Dr. Capano explained that "[t]he entire surface upon which hydrocarbons are depositing would include … the stage" and that was "certainly not within the spirit of the Court's construction." *Id.* at 182:6-19.

either diamond, graphite, or a liquid."). Fenix nevertheless interpreted the term "growth surface" to include locations where polycrystalline growth was occurring even if the polycrystalline material was <u>not</u> diamond. *See e.g.*, ECF 120 (Fenix Reply Brief) at 6-7 (asserting "the Court held [in its claim construction order] that in the context of the '078 patent, 'diamond' refers to all domains of growth, including 'graphite' and 'diamond-like carbon.'"). Dr. Capano disagreed that graphite or other non-diamond carbon was, in fact, "diamond." *See e.g.*, Ex. 6 at ¶¶ 78-79, 103. Dr. Capano explained "the growth surface as defined by the Court and as applied in my report has its plain and ordinary meaning that is the surface upon which diamond growth is occurring. The non-diamond carbon is not included in the growth surface." Ex. 8 at 94:15-18; *see also* Ex. 6 at ¶ 168 (explaining Nouveau's images show "non-diamond carbon or graphitize[d] polycrystalline material").

The inquiry is complex. A skilled artisan viewing a photograph of a batch of diamonds would know that the dark, polycrystalline material around the single crystal diamonds "could be different types of materials" including "polycrystalline diamond," "polycrystalline graphite," "a combination thereof," or "other forms of carbon," yet Dr. Capano was aware the CVD industry and its literature may, "[i]n some cases," inaccurately refer to undefined polycrystalline material as "polycrystalline diamond." Ex. 8 at 77:11-79:19. Dr. Capano explained that for a given sample he would analyze any apparently polycrystalline material "to see what the relative partitioning is between polycrystalline diamond and any other form of carbon" even though "[s]ome would include [it] to be polycrystalline diamond" without analysis. *Id.* at 82:13-83:9. While Dr. Capano's report stated in paragraph 173 "I do not interpret growth surface to include the non-diamond <u>or polycrystalline diamond</u> that grows at the periphery of the single crystal diamond," when asked about this paragraph at his deposition

he clarified: "I have no evidence that polycrystalline diamond is pure polycrystalline diamond free of non-diamond carbon or polycrystalline graphite." *Id.* at 96:9-19. Although Dr. Capano's word choice in explaining this nuanced issue was not always ideal, the record as a whole reflects the reasonableness of Plaintiffs' reliance on his expert opinions.

### 2. Maintenance of 20-Degree Temperature Gradients

In their *Markman* arguments, Plaintiffs explained that "nothing in Plaintiffs' complaints (or, for that matter, in the '078 specification) suggests that independent claims 1 and 12 require 'using temperatures measured' to maintain those gradients. Nor, to be clear, do Plaintiffs allege that Defendants do so. Rather, Plaintiffs believe . . . that Defendants ensure proper gradients by controlling other process parameters like those set forth in the '078 specification." ECF 34 at 4-5. The Court's *Markman* order did not explain there could be no infringement if Defendants do not use temperature measurements to maintain the gradients. Rather, the Court's *Markman* order *agreed* with Plaintiffs "that the 'using' limitation must be rejected" because "language in the Patent appears to define 'controlling' more broadly, mentioning that other inputs are also 'used' to control the gradients." ECF 42 at 16.

Accordingly, Plaintiffs adduced evidence from which a reasonable factfinder could find that Nouveau was controlling the temperature of the growth surface despite not directly measuring surface temperatures of the growth surface in each batch. *See* Ex. 6, ¶¶ 181, 190-224, 235-265. In opposing summary judgment, Plaintiffs explained "Dr. Capano presented affirmative evidence that Nouveau maintains infringing temperature gradients, namely proof that Nouveau performs steps to control temperature gradients …." ECF 114 at 14 (citing ECF 110 (Plaintiffs' Statement of Material Facts) at ¶¶ 96-99). That evidence includes "▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



….” Ex. 6 at ¶ 205; *see also id.* at ¶¶ 197-98 (“█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████”). Dr. Capano also discussed how Nouveau achieves the claimed temperature gradients through: (i) █████████████; (ii) ███████████████████████████████████████; (iii) ██████████████████; and (iv) █████████████████████. *Id.* at ¶ 190. And he tied his discussion directly to the images produced in the Nouveau Affidavit. *Id.* at ¶¶ 190-198.

On summary judgment, Fenix argued that a side-contact holder was needed to maintain gradients under 20º C, but the Court found that Plaintiffs' expert testimony raised a genuine dispute about whether that was true. ECF 133 at 23. Fenix also asserted that Nouveau's polycrystalline growth must have resulted from gradients above 20º C, but the Court rejected that argument too because polycrystalline growth can occur for other reasons. *Id.* at 24-25. Finally, Fenix pointed to data created for the litigation purportedly showing that Nouveau's actual temperature gradients exceed 20º C. *Id.* at 25-26. But the Court excluded that evidence due to Fenix's earlier position that it could not access Nouveau's documents. *Id.* at 26-27. The Court nevertheless concluded that because Nouveau said it "does not even measure temperature gradients during diamond growth," an inference can be drawn that it does not control those gradients. *Id.* at 27.

E.    '189 Patent

As explained above, Plaintiffs were able to obtain only limited discovery from Nouveau in the litigation and were thus unable to fully develop their infringement case for the '189 patent by summary judgment. Accordingly, on September 18, 2020, Plaintiffs served Fenix with the Expert Report of John Jarosz acknowledging "U.S. Patent No. RE41,189 is no longer

at issue." Ex. 15 at 2 n.2. Likewise, Dr. Capano's September 18, 2020 infringement report did not address the '189 patent. Fenix's October 13, 2020 motion for summary judgment—in just nine lines—requested summary judgment of non-infringement for the '189 patent on the basis of Plaintiffs' concession. ECF 106 at 12.

### F.    Plaintiffs' Covenants Not to Sue

On November 17, 2020, Plaintiffs granted a covenant not to sue Fenix for the '189 patent, and requested Fenix withdraw its counterclaims as to the '189 Patent. Ex. 9. Months passed and Fenix never withdrew its counterclaims. Ultimately, the Court dismissed the counterclaims relating to the '189 patent on June 16, 2021. ECF 133 at 30. At oral argument on Fenix's summary judgment motion, Plaintiffs also moved to dismiss their own claims under the '189 patent, and that motion was denied. *Id.* at 31.

On June 16, 2021, the Court granted summary judgment of non-infringement as to both patents-in-suit. On June 21, 2021, Plaintiffs granted Fenix a covenant not to sue on the '078 patent "[a]s long as the Court's current constructions . . . remain the law." Ex. 10. Plaintiffs then moved to dismiss Fenix's invalidity counterclaim. ECF 135 at 3; Ex. 10.

### G.    Appeal

Consistent with Plaintiffs' covenant not to sue on the '078 patent "[a]s long as the Court's current constructions . . . remain the law," Plaintiffs appealed from this Court's final judgment to have the Court's claim constructions reviewed. Fenix filed a motion to dismiss Plaintiffs' appeal on jurisdictional grounds based on the covenant not to sue. Ex. 11. Fenix's motion was denied by the Federal Circuit. Ex. 12. This confirms the appeal was not frivolous.

On appeal, Plaintiffs re-asserted their proposed claim construction of "growth surface" as "the diamond seed surface or diamond surface that is closest to the plasma, upon which

single-crystal growth primarily occurs as the diamond grows." Ex. 13 at 34[7]. Plaintiffs also

argued there were genuine disputes of fact as to both whether Nouveau grows single-crystal

diamond on the growth surface and whether Nouveau controlled the temperature of the growth

surface of its diamonds. *See id.* at 22-23, 35-41.

Settlement discussions were ongoing throughout the appeal. In the end, Plaintiffs

voluntarily moved to dismiss the appeal on July 12, 2023 solely due to M7D's dire financial

situation. As noted above, M7D filed for bankruptcy soon thereafter.

## III.   ARGUMENT

### A.   *Octane Fitness* Does Not Support Penalizing Carnegie Science

*Octane Fitness* stresses exceptional case findings are for "the rare case" and not the

norm. 572 U.S. at 555. It cautions fee awards are not "a penalty for failure to win a patent

infringement suit." *Id.* at 548. "'The legislative purpose behind [35 U.S.C.] § 285 is to prevent a

party from suffering a gross injustice,' not to punish a party for losing." *Munchkin, Inc. v. Luv

n'Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (citation omitted). As explained below,

Plaintiffs have not engaged in the type of egregious behavior typical of § 285 "exceptional"

cases.

### B.   Plaintiffs' Claims Were Not Unreasonable

#### 1.   Infringement of the '078 Patent

After issuance of the Court's *Markman* order and receipt of the Nouveau Affidavit,

Plaintiffs continued to accrue evidence of Fenix's infringement of the '078 Patent, including

---

[7] Fenix's Motion falsely asserts that "[o]n appeal, Plaintiffs did not even attempt to advocate their original construction, but instead argued that 'growth surface' be construed as 'top surface.'" ECF 162-22 at 24–25, 27. Mot. at 12 n.4. Plaintiffs' opening claim construction brief explained "[t]he '078 patent uses the term 'growth surface' interchangeably with the term 'top surface.'" ECF 29 at 13-14. The same point was argued to the Federal Circuit. *See* Ex. 13 at 27.

expert testimony from Dr. Capano showing a skilled artisan would understand diamonds grown through Nouveau's processes were "stand alone diamond[s] having insubstantial non-monocrystalline growth" and Nouveau's processes maintained 20-degree temperature gradients without using temperatures measured to maintain those gradients. Supra, II. D.

### (a) Plaintiffs' Argument Regarding Insubstantial Non-Monocrystalline Growth on the Growth Surface Was Not Foreclosed by the *Markman* Order

On summary judgment, the Court ultimately rejected Dr. Capano's opinion's regarding how a skilled artisan would assess whether non-monocrystalline growth is "insubstantial." However, nothing in the Court's *Markman* order made clear that Dr. Capano's opinions had been foreclosed. Under similar circumstances, the Federal Circuit *reversed* a district court's § 285 fee award against a plaintiff for purportedly "continuing to litigate an objectively baseless position" after claim construction where "the district court's pre-summary judgment claim construction" did not, in fact, "foreclose [plaintiff's] infringement position." *Biax Corp. v. Nvidia Corp.*, 626 Fed. Appx. 968, 972 (Fed. Cir. 2015).

After the *Markman* order, it was necessary for Plaintiffs to rely on their expert's explanation of "the meaning a skilled artisan would accord to" the term "insubstantial non-monocrystalline growth" when assessing their infringement position. *See* ECF 42 at 28. Fenix did as well. Fenix's expert Dr. Pinneo reached the same conclusion that "[t]he Court did not define 'insubstantial'" in the *Markman* order. *See* Ex. 14 (Pinneo Rpt.) at ¶ 479. Dr. Pinneo used a different definition of "insubstantial" than Dr. Capano. *See id.* (adopting a quantitative "one percent" test). However, the crucial question of whether the *Markman* order foreclosed either expert's interpretation of "insubstantial non-monocrystalline growth" is indisputable; it did not.

Fenix leans heavily on the Court's conclusion that one of Plaintiffs' arguments on this issue was a "thinly disguised motion-for-reconsideration" of the Court's construction of "growth

surface." However, the confusion on that issue stemmed from a genuine question as to whether the "growth surface" included surfaces upon which "non-diamond carbon" material such as graphite were grown during the MPCVD process (e.g., the stage). *Supra*, II.D.1.b; *Biax*, 626 Fed. Appx. at 972. This issue was relevant to Plaintiffs' assertion that summary judgment was inappropriate because "Plaintiffs were not provided [unfinished] product samples including the byproduct growth." *See* ECF 114 at 1, 7. The Court's summary judgment order implicitly clarified, for the first time, that the term "***diamond***" in its construction of "growth surface" included **non-diamond** carbon such as graphite and that the claims require "grow[ing] [only] single-crystal diamond . . . on the growth surface" because there is no question Fenix's finished diamonds were, in fact, grown on the growth surface. ECF 133 at 22.

> **(b)    Plaintiffs' Contention That Nouveau's Process Maintained 20-Degree Temperature Gradients Without Using Measured Temperatures Was Not Foreclosed by the *Markman* Order**

On summary judgment, the Court found paragraph 5.k of the Nouveau Affidavit established "the fact that Nouveau does not even measure temperature gradients during diamond growth, and this fact supports an inference that Nouveau does not maintain 20-degree temperature gradients." ECF 133 at 27 (further relying on the fact "[t]he plaintiffs were permitted to depose the affiants under the Hague Convention, and they did so" in November 2020). As described in Section II.D.2 supra, Plaintiffs explained during claim construction that using temperatures measured to maintain the gradients was not required by the claims and the *Markman* order *agreed* with Plaintiffs "that the 'using' limitation must be rejected" because "language in the Patent appears to define 'controlling' more broadly." ECF 42 at 16. Accordingly, Plaintiffs reasonably believed that Dr. Capano's analysis showing how Nouveau maintains infringing temperature gradients during diamond production without using temperature measurements was not foreclosed by the Court's *Markman* order. *Supra* II.D.2. It

- 15 -

was also reasonable for Plaintiffs to seek discovery on precisely how these temperature gradients were controlled rather than accept the erroneous Nouveau Affidavit. *Supra* II.C.

On summary judgment, Fenix advanced no non-infringement argument related to failure to *measure* temperature gradients. *See* ECF 106 at 10-12. On its face, that argument would have contradicted the *Markman* order. *Supra* II.D.2 Each argument Fenix *did* make on summary judgment was rejected by the Court. *Id.* (citing ECF 133 at 23-27).

As such, there is no *objective* evidence supporting a finding that Plaintiffs' infringement position as to the temperature gradient limitations was unreasonable at the time.

Fenix's Motion asserts that "Plaintiffs' own experts conceded that to practice the '078 patent, 'one needs to directly measure the temperature gradients.'" Mot. at 4-5. But this is misleading, as the quoted testimony actually explains:

> [W]hen you're developing a process for the <u>first time</u> and demonstrating it for the <u>first time</u>, one needs to directly measure the temperature gradients. As you get experience with doing the same process over and over again, you may find other variables which are correlated with the temperature gradients and you may seek to control those. But in the case of the Yan dissertation, it's an academic thesis and you are growing something for the first time.

*See* ECF 164-9 (Gleason Dep.) at 66:20-68:5 (emphasis added). Accordingly, this has no bearing on Nouveau's repeatable commercial processes.[8]

## 2.      Infringement of the '189 Patent

As explained above, Plaintiffs filed other suits in this Court and obtained settlements from both Pure Grown Diamonds and ALTR. Plaintiffs' withdrawal of its claims relating to the '189 patent when it was unable to fully develop its infringement case during fact discovery

---

[8] The Motion (at 4-5) also cites Dr. Capano's testimony explaining that—consistent with the *Markman* order and the '078 patent—in "the MPCVD process of Fenix/Nouveau temperature … can be <u>controlled indirectly</u>. . . . [B]y adjusting parameters a control over temperature can be achieved even though it is never measured." ECF 164-10 (Capano Rpt.) at ¶ 369 (emphasis added).

shows its reasonableness and supports Plaintiffs' position that this is not an exceptional case. Fenix acknowledges receiving notice that Plaintiffs were considering withdrawing their '189 patent claims in August 2020 (Mot. at 16) and were informed by September 18, 2020 that "U.S. Patent No. RE41,189 is no longer at issue." ECF 99-10 at ¶ 1 n.2. "[A] patentee's announcement that it [i]s no longer pursuing particular claims, coupled with its ceasing to litigate them, [i]s sufficient to remove those claims from the case even without [the formalities of filing a motion or stipulation]" but not a defendant's counterclaims. *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1193 (Fed. Cir. 2014) (citation omitted). Even after being granted a covenant not to sue on the '189 patent, Fenix persisted with its counterclaims, thus confirming its intent to continue litigating them regardless of Plaintiffs' actions.

Fenix's citations to *Blackbird* and *Monolithic Power* are inapposite as both involved a pattern of excessive misconduct not present here. Each serves only to contrast Plaintiffs' reasonableness in this suit as opposed to a true exceptional case.

### C.   Fenix's Conduct Illustrates Plaintiffs Were Not Clearly Unreasonable

"[T]he conduct of the parties is a relevant factor under *Octane*'s totality-of-the-circumstances inquiry, including the conduct of the movant." *Stone Basket Innovations,* 892 F.3d at 1181-83 (Fed. Cir. 2018) (quoting *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015). "Such conduct includes [the] failure to send any communication to [the opposing party] that highlighted and set out with precision the specific … argument" on which the movant "now relies for its assertion" the opposing party "should have known" its conduct was "clearly unreasonable." *Id*. at 1181. The Federal Circuit has explained that a crucial factor in any fees consideration is whether the moving party "provide[d] early, focused, and supported notice of its belief that it was being subjected to

exceptional litigation behavior." *ThermoLife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1357 (Fed. Cir. 2019) (quoting *Stone Basket*, 892 F.3d at 1181).

Far from providing the "early, focused, and supported notices" approved by the Federal Circuit, Fenix's Motion does not identify ***any*** communication to Plaintiffs highlighting and setting out with precision the arguments on which Fenix now relies to claim an exceptional case beginning July 14, 2020. The only evidence the Motion identifies is Fenix's June 30, 2020 letter brief to the Court (Mot. at 14 (citing ECF 62, Ltr. at 3)), which does not set out with precision the arguments it now relies on to claim fees. Plaintiffs adduced evidence disproving each of the vague and conclusory assertions raised in Fenix's letter brief. Section II.D *supra*.

Fenix's conduct thus weighs strongly against an exceptional case finding.

### D.     Plaintiffs' Litigation Tactics Were Not Exceptional

Fee awards must be limited to fees that would not have been incurred "but for" any acts of misconduct. *Fox v. Vice*, 563 U.S. 826 (2011); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1369 (Fed. Cir. 2013) (acknowledging *Fox*'s pertinence to § 285).

#### 1.     M7D's Customer Communications Do Not Support Fee-Shifting

Fenix's allegations regarding M7D's business communications suffer multiple fatal flaws, any of which is independently dispositive. *First*, the communications took place ***before*** service of the Nouveau Affidavit, and thus the alleged statements regarding infringement were necessarily in good faith under Fenix's timeline. *Second*, even setting aside the timing, Fenix's own case law confirms the alleged statements do not give rise to an exceptional case finding. And finally, none of these communications even involved Carnegie Science.

##### (a)     The Timing of the Alleged Communications Precludes an Exceptional Case Finding

Fenix contends that "after June 2020," Plaintiffs' alleged "continued leveraging of their

patents to steal Fenix's business was unscrupulous and makes this case exceptional." Mot. at 19. This appears to be a tacit admission that communications before the Nouveau Affidavit cannot render the case exceptional.[9]

This admission is fatal to Fenix's argument. While the Motion quotes language from Ms. Rechner's deposition regarding statements to customers about patent infringement (Mot. at 18, quoting ECF 164-11 (Rechner Dep.) at 148:8-150:16), these discussions took place ***before*** the Nouveau Affidavit. Fenix is only able to identify one customer meeting that took place after service of the affidavit: ██████████████████████. Mot. at 18 (citing ECF 164-11 at 127:19-128:9). Fenix offers no evidence that M7D told ██████ that CVD infringed its patents ██ ████████████████████████████████████████████████████████ ████████ Accordingly, Fenix has offered no evidence that after service of the Nouveau Affidavit, Plaintiffs told any customer that CVD infringed either patent-in-suit. Thus, by Fenix's own standard, M7D's communications cannot make this case exceptional.

### (b) Fenix's Case Law Precludes an Exceptional Case Finding

Fenix only cites one case that even attempts to tie such communications to an exceptional case finding—an unpublished decision out of the Western District of Washington. *GT Dev. Corp. v. Temco Metal Prods. Co.*, No. C04-451Z, 2005 WL 8172247, at *5-7 (W.D. Wash. July 1, 2005). But that case is easily distinguishable from the facts at bar. It involved a suit "brought by a larger corporation against a smaller competitor for the sole purpose of securing the full-function fuel valve market for itself." *Id.* at *5. However, here Fenix does not allege that Plaintiffs' "sole purpose" was to secure the market for itself nor is there any allegation of an attempt to bully a smaller competitor. Significantly, in *GT*, the Court noted that

---

[9] As explained in Section III.C, *supra*, Fenix is only seeking fees incurred after July 14, 2020— thirty days after service of the Nouveau Affidavit.

the defendant Temco's litigation costs were "nearly equal to Temco's total accumulated operating profit for the last five years." *Id.* at *6 n.3. The opposite dynamic has played out here, with M7D recently filing for Bankruptcy protection. *In re M7D Corp.*, No. 1:23-bk-11699 (Del. Bankr. Oct. 11, 2023). Accordingly, even under Fenix's case law, there is no basis for finding an exceptional case based merely on the types of communications alleged in the Motion.

Fenix also cites *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999), which is a Lanham Act, unfair competition case and does not address § 285 whatsoever. *See id.* at 1342. While the *Zenith* Court discusses what may constitute "bad faith" (*id.* at 1354-55), it made no finding on that issue, noting "that determination is not before us." *Id.* at 1355. Accordingly, at most, *Zenith* provides some dicta that statements that a competitor cannot design around a patent "are inherently suspect." *Id.* at 1354. Tellingly, *Zenith* does not say that such statements necessarily constitute "bad faith." To the contrary, the *Zenith* Court reasoned that "if the patentee knows that the patent is . . . not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith misrepresentation is made out." *Id.* Fenix has not shown that Plaintiffs made such knowing misrepresentations. Accordingly, even under Fenix's interpretation of the case law, this is not an exceptional case.

### 2. Plaintiffs Did Not Unnecessarily Drive Up Litigation Costs

As explained in Section III.B.2 supra, it was Fenix who continued litigating its counterclaims even after it was informed that Plaintiffs were not continuing to litigate infringement of the '189 patent and even after receiving a covenant not to sue, thus disproving Fenix's current argument it was forced to incur fees and costs it otherwise would not have. Notably, Plaintiffs were obliged to submit a validity report for the '189 patent—even after their infringement claims were withdrawn—solely in response to Fenix's invalidity counterclaim. *See* Ex. 7 (Gleason Rpt.), ¶¶ 347-514, 790-797. Fenix's contentions that the Court's *Markman*

order made Plaintiffs' infringement case objectively baseless are entirely inconsistent with the fact that Fenix filed its invalidity counterclaims on May 18, 2020 (ECF 43) *after* that order was issued. If infringement were impossible under the *Markman* order—as Fenix contends—those counterclaims would have been unnecessary[10] to file.

### 3.    The '078 Is Not Invalid for Lack of Enablement and Plaintiffs Did Not Withhold Any Evidence

Fenix asserts Plaintiffs' "efforts to withhold documents evidencing non-enablement" make the case exceptional based on *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1027, (Fed. Cir. 2008). There, however, the patentee withheld over two hundred thousand (200,000) pages of probative documents. Whereas, Plaintiffs here withheld zero.

Plaintiffs naturally redacted privileged information on three slides of an investor presentation where Plaintiffs reasonably contended that attorney-client privilege and work product protections remained in place under the common-interest doctrine. *See* ECF 83 at 1-5. Upon *in camera* review, the Court confirmed the redacted legal advice was privileged when first shared, but disagreed that the common-interest doctrine applied because at the time "Huron Capital only contemplated purchasing such an interest."  ECF 88 at 4-6. The Court's order gave no indication that it considered Plaintiffs' efforts to protect privileged information to be frivolous or that Plaintiffs had engaged in misconduct. *See generally* ECF 88.

Moreover, the presentation is irrelevant to the question of enablement because, for example, none of the three Perkins Coie legal professionals who authored the opinions qualify as persons of ordinary skill in the art and "[w]ithout that skill, the witness' opinions are neither relevant nor reliable." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1377 (Fed. Cir. 2022). *See* ECF 164-3 at 3; Ex. 6, ¶ 29 (explaining a person of ordinary skill in

---

[10] Unnecessary absent some additional motive unconnected to Plaintiffs' infringement claims.

the art would have "5-7 years of experience in CVD processing"); Ex. 7, ¶¶ 751-754.

Similarly, Fenix admits the email from Dr. Vohra was also produced. Mot. at 22. There were no efforts by Plaintiffs to withhold documents. "Expressions of outrage and suspicion in the form of attorney argument are not evidence of bad faith." *Therasense, Inc. v. Becton, Dickinson & Co.*, 745 F.3d 513, 516-18 (Fed. Cir. 2014).

While failures to make a claimed invention may be evidence of non-enablement in some contexts (e.g., software), ███████████ inability to "create a commercially sellable synthetic gem which was colorless" after spending just "████ on the total development" is not "indicative of a non-enabling patent disclosure" as Defendant contends. *See* ECF 164-12 (Mot. Ex. 27) at 3; Mot. at 22-23. It speaks only to the large capital investments required by CVD industry participants and is irrelevant to the patent claims which claim neither colors nor the lack thereof. *See* Ex. 1 at 1 (M7D obtained "$████ to provide and operate a production facility" to commercialize Carnegie Science's technology).

In stark contrast to the minimal evidence set forth in Fenix's Motion, Plaintiffs' validity expert, Dr. Gleason, would have provided testimony addressing the *Wands* factors that would have confirmed the claimed inventions could be practiced without undue experimentation and were valid. Ex. 7 (Gleason Rpt.) at ¶¶ 764-781. Because Fenix's Motion fails to show Plaintiffs' enablement (or any other validity) position was "wholly lacking in merit," fee-shifting under § 285 as to unadjudicated validity (or other) issues would be inappropriate. *Munchkin,* 960 F.3d at 1378 (reversing § 285 fee award).

### 4.    Fenix and Nouveau Did Not Cooperate in Providing Requested Discovery from Nouveau

The resistance of Fenix and Nouveau to providing discovery requested by Plaintiffs was well-documented in this matter. Indeed, as a direct result of this documented resistance, the

Court excluded certain evidence produced and relied on by Fenix for one of its non-infringement arguments. *See* ECF 133 at 25-27; *see also* Section II.C *supra*. The Motion does not allege this ruling was in error. Fenix's conduct in this regard thus *disfavors* an exceptional case finding.

### E.    The Court Should Deny Fenix's Request for Attorney Fees

#### 1.    The Court Should Deny Fenix's Request for Attorney Fees Under Section 285

The cases cited by Fenix do not support its request for fees under § 285. In *Adjustacam*, a fee award was mandated because plaintiff sought only "nuisance-value damages against many defendants," made "repeated use of after-the-fact declarations" (e.g., "serv[ing] a new expert report the day of that expert's deposition"), and there was "no dispute that [the accused web] cameras rotate about at least two axes" yet the claims required only a single axis of rotation. *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1361 (Fed. Cir. 2017). Here, Plaintiffs committed no misconduct and, unlike the simple mechanical technology[11] and clear claim construction issues in *AdjustaCam*, the Parties and Court grappled with an array of English-language terms used by skilled artisans to describe arrangements of carbon atoms and how to, for example, determine whether the presence of one such arrangement was "insubstantial."

Further, *Cognex* counsels directly against Fenix's demand for all attorney fees incurred on or after July 14, 2020. In *Cognex*, this Court granted "attorneys' fees for contesting any motions brought by defendants that have sought to reargue what was already decided by the Court previously." *Cognex Corp. v. Microscan Sys., Inc.*, No. 13-cv-2027 (JSR), 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014). Even if Plaintiffs explanations in Section III.B *supra* were rejected, just a small percentage of summary judgment briefing was spent on the lone

---

[11] The simple and clear nature of the claim construction issue in *Taurus* (regarding the term "user") is similar to that of *Adjustacam* except in the software context. *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1329 (Fed. Cir. 2013).

argument the Court characterized as having a "motion-for-reconsideration aspect." *See* ECF 133 at 19-20. Any fee award on that basis, should cover, at most, Fenix's fees for briefing that issue.

### 2. The Court Should Deny Fenix's Request for Attorney Fees and Non-Taxable Costs Under The Court's Inherent Power

Section 285 does not include shifting of expert fees as part of that remedy. *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 379 (Fed. Cir. 1994). Fenix thus asks this Court to sanction Plaintiffs by awarding expert costs using its inherent powers. But "[w]ithout a finding of fraud or bad faith whereby the 'very temple of justice has been defiled', a court enjoys no discretion to employ inherent powers to impose sanctions." *Id.* at 378. Nothing about this case justifies such a harsh sanction.

### F. The Court Should Apportion Any Award Entirely to M7D

Fenix's request to hold Carnegie Science jointly and severally liable should be rejected. Because patentees necessarily have an interest in the validity of their patents, prudential standing requirements dictate they must be joined in infringement suits brought by their licensees. *See e.g., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1347 (Fed. Cir. 2001). Carnegie Science, a non-profit research institution, was only party to the present litigation because it was required to join as owner of the patents-in-suit. The litigation was initiated by M7D pursuant to the terms of their license agreement. *See* Ex. 2 at 5. The license agreement granted control of patent enforcement litigation decisions to M7D and obligated Carnegie Science to cooperate. *Id.* at 5-6. ████████████████████████████ ████████████████████████████████████████████. *Id.*

In *Evident Corp. v. Church & Dwight Co.,* 399 F.3d 1310, 1315-16 (Fed. Cir. 2005), the Federal Circuit considered whether the district court erred "when it chose not to apportion the attorney fee award" between the patentee and exclusive licensee. It found that "[b]ecause of the

close, intertwined relationship between the [patentee partnership's] partners, the [exclusive

licensee's] shareholders, and the inventors of the '782 patent, [the patentee] cannot be said to be

innocent of the underlying inequitable conduct" that made the case exceptional. *Id.* at 1316.

Accordingly, the trial court did not abuse its discretion in making both the patentee and exclusive

licensee jointly and severally liable for the attorney fee award under the facts of that case. *Id.*

The circumstances here are entirely different. All of the purported misconduct identified by

Fenix's motion is specific to M7D and none relates to Carnegie Science. *See e.g.*, Mot. at 16-23.

Carnegie Science also had no control over the withdrawal of the appeal, as its consent could not

be "unreasonably withheld or delayed." Ex. 2 at 5. The withdrawal of the appeal was solely the

result of M7D's ████████████████████████████████████████████.[12]

Should the Court find any amount of fee shifting to be appropriate—and it should not—

the entirety of the fee award should be apportioned to M7D and none to Carnegie Science.

Moreover, the Court should closely scrutinize the purported $3.5 million in fees requested by

Fenix—all of which Carnegie Science disputes—to ensure fees actually paid by or on behalf of

Nouveau or other third parties are not erroneously included in Fenix's claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Fenix's motion to find this case

exceptional under 35 U.S.C. § 285 and the Court's inherent authority, and deny Fenix's request

for reasonable attorney fees and other non-taxable costs incurred on or after July 14, 2020.

---

[12] On October 11, 2023, M7D filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. The bankruptcy is expected to result in no distributions to creditors, including Carnegie Science. Carnegie Science has thus been left to defend this motion at its own cost, despite M7D's initiation and control of the litigation.

DATED:  November 3, 2023          Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP


By:   */s/ April E. Isaacson*
       GIANFRANCO FINIZIO
       (NY Bar Number 4843751)
       gfinizio@kilpatricktownsend.com
       1114 Avenue Of The Americas
       New York, NY 10036
       Tel: (212) 775-8840 / Fax: (646) 786-4442

       APRIL E. ISAACSON
       (admitted *pro hac vice*)
       aisaacson@kilpatricktownsend.com
       Two Embarcadero Center, Suite 1900
       San Francisco, CA  94111
       Tel: (415) 576-0200 / Fax: (415) 576 0300

       ALTON L. ABSHER III
       (*pro hac vice* application pending)
       aabsher@kilpatricktownsend.com
       1001 West Fourth Street
       Winston-Salem, NC 27101
       Tel: (336) 607-7300 / Fax: (336) 607-7500

       MATTHEW J. MEYER
       (admitted *pro hac vice*)
       mmeyer@kilpatricktownsend.com
       1302 El Camino Real, Suite 175
       Menlo Park, CA 94025
       Tel: 650-326-2400 / Fax: 650-326-2422

       Attorneys for Plaintiff
       CARNEGIE INSTITUTION OF WASHINGTON